# UNITED STATES *v.* COCA COLA COMPANY OF ATLANTA.

## ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 562. Argued February 29, 1916.—Decided May 22, 1916.

Under the Food and Drugs Act of 1906, the fact that a formula has been made up and followed and a distinctive name therefor adopted does not suffice to take an article from § 7, subd. 5, of the Act. In such a case the standard by which the combination is to be judged is not necessarily the combination itself.

A poisonous or deleterious ingredient with the injurious effect stated by the statute may be an added ingredient in the statutory sense although it is covered by the formula and made a constituent of the article sold.

In construing § 7, subd. Fifth of the Food and Drugs Act *held* that the term adulteration is used in a special sense and its ordinary meaning is not controlling; that an article may be adulterated by the adding of an injurious ingredient including a component part of the article itself; that adulteration must not be confused with misbranding and provisions as to latter do not limit the explicit provisions of § 7 of adulteration; and that proprietary foods sold under descriptive names are within its provisions, including those which were in the market when the Act was passed.

It would reduce the Food and Drugs Act to an absurdity to so construe it as to regard a compound food product, the formula of which included a poisonous or deleterious ingredient, as adulterated within the meaning of § 7 if such ingredient were omitted.

Whether an added ingredient—such as caffeine—is poisonous or deleterious *held*, in this case, in view of decided conflict of competent evidence, to be a question for the jury.

While a distinctive name may be purely arbitrary it must be one that distinguishes the article; and where more than one name, each descriptive of an article, are united, it amounts to misbranding if the article sold does not contain any of the articles generally known individually by any of such names.

THE facts, which involve the construction and application of the adulteration and misbranding provisions of the Food and Drugs Act of 1906, are stated in the opinion.

*Mr. Assistant Attorney General Underwood,* with whom *Mr. Elliott Cheatham* was on the brief, for the United States:

*Mr. Harold Hirsch* and *Mr. J. B. Sizer,* with whom *Mr. A. W. Chambliss* and *Mr. W. D. Thomson* were on the brief, for the defendant in error:

In construing a statute, every section, provision and clause should be explained by reference to every other, and if possible, every clause and provision shall avail, and have the effect contemplated by the legislature.

One portion of a statute should not be so construed as to annul or destroy what has been clearly granted by another. The most general and absolute terms of one section may be qualified and limited by conditions and exceptions contained in another, so that all may stand together. *Peck* v. *Jenness,* 7 How. 612, 623; *Montclair* v. *Ransdell,* 107 U. S. 147; *United States* v. *Lexington Mill,* 232 U. S. 399, 409; *Lake County* v. *Rollins,* 130 U. S. 662, 670; *Hamilton* v. *Rathbone,* 175 U. S. 414; *Washington Market Co.* v. *Hoffman,* 101 U. S. 112; *United States* v. *Antikamnia Co.,* 231 U. S. 654, 665; *Hall-Baker Grain Co.* v. *United States,* 198 Fed. Rep. 614.

Even if caffeine is a poisonous or deleterious substance, which might render the article in controversy injurious to health, its presence would not render the article subject to seizure and condemnation under the Act unless it constituted adulteration within the meaning of the Act.

For object of the Food and Drugs Act see *Savage* v. *Jones,* 225 U. S. 501, 530; *Standard Stock Food Co.* v. *Wright,* 225 U. S. 540; *United States* v. *65 Cases,* 170 Fed. Rep. 449; *McDermott* v. *Wisconsin,* 228 U. S. 115.

The cases referred to by the Government do not sustain any different proposition. The purpose of the Act is to secure the purity of foods.and drugs, and to inform the purchasers of what they are buying. *United States* v. *Antikamnia Co.,* 231 U. S. 654, 665; and see Cong. Rec., Feb. 20, 1906, pp. 2786, 2787.

The statute contemplates a standard and the Government in the libel filed in this case set out the standard when it claimed to have seized a food product known and sold as Coca-Cola. In other words, the product known and sold as Coca-Cola is the standard; it is the product that must be adulterated. Gruley on Act, pp. 8, 22.

Where there is no standard fixed by any statute the court must and will fix for itself a proper standard based on the evidence. *Von Bremen* v. *United States,* 192 Fed. Rep. 905; *People* v. *Jennings,* 132 Michigan, 662. Such a standard is obtained from trade knowledge of the article. *McCord* v. *United States,* 182 Fed. Rep. 47; *United States* v. *St. Louis Coffee Mills,* 189 Fed. Rep. 193; *United States* v. *Frank,* 189 Fed. Rep. 195; *200 Chests of Tea,* 9 Wheat. 431; *Hudson Co.* v. *United States,* 192 Fed. Rep. 920; *Libby* v. *United States,* 210 Fed. Rep. 148; *United States* v. *Sweet Valley Wine Co.,* 208 Fed. Rep. 85; *United States* v. *75 Boxes,* 198 Fed. Rep. 934; *Weeks* v. *United States,* 224 Fed. Rep. 64; *Cadwalader* v. *Zeh,* 151 U. S. 171.

The Government has admitted that a standard must be established, and is to be established in finding out what is a given substance as recognized by reliable manufacturers and dealers. See Notices Judgm., 123, 130, 135.

The only standard in this case is a food product— Coca-Cola—which has always contained caffeine, *Washburn* v. *United States,* 224 Fed. Rep. 395, 398, and therefore caffeine in this product is not an "added" ingredient or an adulteration within the meaning of the Act.

"Adulterate" means to make impure by the admixture of other, or baser, or foreign ingredients; to render counter-

feit. *St. Louis* v. *Judd*, 236 Missouri, 1; *Commonwealth* v. *Kevin*, 202 Pa. St. 23, 29; *Hall-Baker Grain Co.* v. *United States*, 198 Fed. Rep. 614; *United States* v. *Lexington Mill*, 232 U. S. 399; *United States* v. *11,150 Pounds of Butter*, 195 Fed. Rep. 657, 661.

"Added ingredient" means something foreign to the article to which it is added, therefore an ingredient which is a constituent element and is not foreign is not an added one. *Weeks* v. *United States*, 224 Fed. Rep. 64, 67; *Curtice Bros. Co.* v. *Barnard*, 209 Fed. Rep. 591, 594; Cong. Rec. June 21, 1906, pp. 8891–2, 8900, and Feb. 21, 1906, pp. 2647–2750, Jan. 10, 1906, p. 987 and Feb. 20, 1906, p. 2729, Feb. 19, 1906, p. 2647; H. R. Rep. No. 2118, March 7, 1906, 59th Cong., 1st sess.

Even if the statute is one for the protection of the public health the bills show that Congress did not intend to condemn every article having a deleterious ingredient in it, even though it may have rendered the article injurious to health. It was necessary to prove further, that the deleterious ingredient was added. The word "ingredient" indicates Congress had in mind mixed and compound articles of food rather than simple ones.

Since Congress has permitted the use in articles of food of substances which are confessedly habit-forming and deleterious, it can be assumed that it intended to prohibit the use of caffeine, which is admitted to be far less harmful than any of those enumerated in the proviso referred to, and which was and had been for several hundred years prior to the passage of the Act, an ingredient in food articles of almost universal use.

The caffeine contained in the product Coca-Cola is not a poisonous ingredient, or a deleterious ingredient, which may render said product injurious to health, so as to constitute an adulteration within the purview of the Act.

The product is not misbranded within the meaning of

the Act. *Nashville Syrup Co.* v. *Coca-Cola Co.*, 215 Fed. Rep. 527; *Coca-Cola Co.* v. *Gay-Ola Co.*, 200 Fed. Rep. 720.

This name was registered by claimant under the Act of 1881, and again under the Act of 1905. While all distinctive names are not entitled to registration, no name is entitled to registration unless it is distinctive. It can be distinctive in its original signification, or it may have become so by association. *Canal Co.* v. *Clark*, 13 Wall. 311, 323; *Amoskeag Mfg. Co.* v. *Trainer*, 101 U. S. 51; *Lawrence Mfg. Co.* v. *Tennessee*, 138 U. S. 537; *United States* v. *Steffens*, 100 U. S. 82.

The use of a compound name does not necessarily, or even generally, indicate that the article to which the name is applied contains the substances whose names make up the compound.

A geographical or descriptive name or a symbol may be divested of its original signification. *In re Tolle*, 1872 C. D. 219; *Ex parte Van Eyck*, 1903 C. D. 43; *Ex parte Indiana Bicycle Co.*, 1895 C. D. 66; *Ex parte Jewell Bottling Co.*, 1904 C. D. 150; *Siegert* v. *Gandolfi*, 149 Fed. Rep. 100, 103; *Jacobs* v. *Beecham*, 221 U. S. 263; *Elgin Co.* v. *Illinois Watch Co.*, 179 U. S. 665; *La Republique Francaise* v. *Saratoga Vichy Spring Co.*, 191 U. S. 427; *Baglin* v. *Cusiner*, 221 U. S. 580; *Montgomery* v. *Thompson*, 8 R. P. C. 361; *Wotherspoon* v. *Currie*, 5 H. L. 508; *Vinegar Co.* v. *Powell* (1897), A. C. 710; *Reddaway* v. *Banham*, 12 R. P. C. 83, and *House of Lords Dec.*, 13 R. P. C. 218.

Marks, although not susceptible of exclusive appropriation, at common law, frequently acquire a special significance in connection with particular commodities. *Davids* v. *Davids*, 233 U. S. 461, 466.

Use under this Act must, of necessity, make a mark distinctive. See cases in the English courts. *In re Crosfield*, 26 R. P. C. 846; *Re Registered Trademarks*, Nos. 538, 1807 and 158, 839, 32 R. P. C. 40, 50; *Slazengers, Ltd.*, 31 R. P. C. 501, 504. For "distinctive" as defined by the

English Trademark Act (5 Edw., 7, chap. 15); see *Application by Candbury Bros.*, 32 R. P. C. 9, 13; *Application by Berna Commercial Motors, Ltd.*, 32 R. P. C. 113, 118; *Woodward* v. *Boulton Macro Co.*, 32 R. P. C. 173, 198.

The name Coca-Cola is distinctive, and 'distinctive only of the goods of claimant. *United States* v. *30 Cases &c.*, 199 Fed. Rep. 932; *United States* v. *100 Barrels &c.* (Notice of Judgm., No. 300, Food and Drugs Act); *United States* v. *Von Bremen* (Notice of Judgm., 1949); as to Regulation 20, see *United States* v. *300 Cases of Mapleine* (Notice of Judgm., 163); *United States* v. *Qumpert* (Notice of Judgm., No. 806).

For other English cases directly in point, see *Lemy* v. *Watson*, 32 R. P. C. 508; *Fowler* v. *Cripps*, 1906, 1 K. B. 21; *Rex* v. *Butcher*, 99 L. T. 622; and see also *Keasby* v. *Brooklyn Chemical Works*, 142 N. Y. 467; *Carnrick Kidder & Co.* v. *Morson*, 1877, Law Journal Notes on Cases, 71; *La Societe Ferment*, 81 L. J. R. 724; *United States* v. *Two Cases of Chloro-Naptholeum*, 217 Fed. Rep. 477, 483; distinguished as being brought under the Insecticide Act; and see *Libby, McNeil & Libby* v. *United States*, 210 Fed. Rep. 148; *Worden* v. *California Fig Syrup Co.*, 187 U. S. 516; *Manhattan Med. Co.* v. *Wood*, 108 U. S. 218; *Nashville Syrup Co.* v. *Coca-Cola Co.*, 215 Fed. Rep. 527.

MR. JUSTICE HUGHES delivered the opinion of the court.

This is a libel for condemnation under the Food and Drugs Act (June 30, 1906, c. 3915, 34 Stat. 768) of a certain quantity of a food product known as 'Coca Cola' transported, for sale, from Atlanta, Georgia, to Chattanooga, Tennessee. It was alleged that the product was adulterated and misbranded. The allegation of adulteration was, in substance, that the product contained an added poisonous or added deleterious ingredient, caffeine,

which might render the product injurious to health.   It
was alleged to be misbranded in that the name 'Coca
Cola' was a representation of the presence of the sub-
stances coca and cola; that the product "contained no
coca and little if any cola" and thus was an "imitation"
of these substances and was offered for sale under their
"distinctive name."   We omit other charges which the
Government subsequently withdrew.   The claimant an-
swered, admitting that the product contained as one of
its ingredients "a small portion of caffeine," but denying
that it was either an 'added' ingredient, or a poisonous
or a deleterious ingredient which might make the product
injurious.   It was also denied that there were substances
known as coca and cola "under their own distinctive
names," and it was averred that the product did contain
"certain elements or substances derived from coca leaves
and cola nuts."   The answer also set forth, in substance,
that 'Coca Cola' was the 'distinctive name' of the product
under which it had been known and sold for more than
twenty years as an article of food, with other averments
negativing adulteration and misbranding under the provi-
sions of the Act.

Jury trial was demanded, and voluminous testimony
was taken.   The District Judge directed a verdict for the
claimant (191 Fed. Rep. 431), and judgment entered
accordingly was affirmed on writ of error by the Circuit
Court of Appeals (215 Fed. Rep. 535).   And the Govern-
ment now prosecutes this writ.

First.   As to '*adulteration.*'   The claimant, in its sum-
mary of the testimony, states that the article in question
"is a syrup manufactured by the claimant  .  .  .  and
sold and used as a base for soft drinks both at soda foun-
tains and in bottles.   The evidence shows that the article
contains sugar, water, caffeine, glycerine, lime juice and
other flavoring matters.   As used by the consumer, about
one ounce of this syrup is taken in a glass mixed with

about seven ounces of carbonated water, so that the consumer gets in an eight ounce glass or bottle of the beverage, about 1.21 grains of caffeine." It is said that in the year 1886 a pharmacist in Atlanta "compounded a syrup by a secret formula, which he called 'Coca-Cola Syrup and Extract'"; that the claimant acquired "the formula, name, label and good will for the product" in 1892, and then registered "a trade-mark for the syrup consisting of the name Coca Cola" and has since manufactured and sold the syrup under that name. The proportion of caffeine was slightly diminished in the preparation of the article for bottling purposes. The claimant again registered the name 'Coca Cola' as a trade-mark in 1905, averring that the mark had been "in actual use as a trade-mark of the applicant for more than ten years next preceding the passage of the act of February 20, 1905," and that it was believed such use had been exclusive. It is further stated that in manufacturing in accordance with the formula "certain extracts from the leaves of the Coca shrub and the nut kernels of the Cola tree were used for the purpose of obtaining a flavor" and that "the ingredient containing these extracts," with cocaine eliminated, is designated as "Merchandise No. 5." It appears that in the manufacturing process water and sugar are boiled to make a syrup; there are four meltings; in the second or third the caffeine is put in; after the meltings the syrup is conveyed to a cooling tank and then to a mixing tank where the other ingredients are introduced and the final combination is effected; and from the mixing tank the finished product is drawn off into barrels for shipment.

The questions with respect to the charge of 'adulteration' are (1) whether the caffeine in the article was an added ingredient within the meaning of the Act (§ 7, subd. Fifth) and, if so, (2) whether it was a poisonous or deleterious ingredient which might render the article injurious to health. The decisive ruling in the courts below re-

sulted from a negative answer to the first question. Both the District Judge and the Circuit Court of Appeals assumed for the purpose of the decision that as to the second question there was a conflict of evidence which would require its submission to the jury. (191 Fed. Rep. 433; 215 Fed. Rep. 540.) But it was concluded, as the claimant contended, that the caffeine—even if it could be found by the jury to have the alleged effect—could not be deemed to be an 'added ingredient' for the reason that the article was a compound, known and sold under its own distinctive name, of which the caffeine was a usual and normal constituent. The Government challenges this ruling and the construction of the statute upon which it depends; and the extreme importance of the question thus presented with respect to the application of the Act to articles of food sold under trade names is at once apparent. The Government insists that the fact that a formula has been made up and followed and a distinctive name adopted do not suffice to take an article from the reach of the statute; that the standard by which the combination in such a case is to be judged is not necessarily the combination itself; that a poisonous or deleterious ingredient with the stated injurious effect may still be an added ingredient in the statutory sense, although it is covered by the formula and made a constituent of the article sold.

The term 'food' as used in the statute includes "all articles used for food, drink, confectionery, or condiment . . . whether simple, mixed, or compound" (§ 6). An article of 'food' is to be deemed to be 'adulterated' if it contain "any added poisonous or other added deleterious ingredient which may render such article injurious to health." (Sec. 7, subd. Fifth.[1]) With this

---

[1] Section 7, with respect to 'confectionery' and 'food' is as follows:

"Sec. 7. That for the purposes of this Act an article shall be deemed to be adulterated:

. . .

section is to be read the proviso in § 8, to the effect that "an article of food which does not contain any added poisonous or deleterious ingredients shall not be deemed to be adulterated or misbranded" in the case of "mixtures or compounds which may be now or from time to time hereafter known as articles of food, under their own distinctive names," if the distinctive name of another article is not used or imitated and the name on the label or brand is accompanied with a statement of the place of production. And § 8 concludes with a further proviso that nothing in the Act shall be construed "as requiring or compelling proprietors or manufacturers of proprietary foods which

"In the case of confectionery:

"If it contains terra alba, barytes, talc, chrome yellow, or other mineral substance or poisonous color or flavor, or other ingredient deleterious or detrimental to health, or any vinous, malt or spirituous liquor or compound or narcotic drug.

"In the case of food:

"First. If any substance has been mixed and packed with it so as to reduce or lower or injuriously affect its quality or strength.

"Second. If any substance has been substituted wholly or in part for the article.

"Third. If any valuable constituent of the article has been wholly or in part abstracted.

"Fourth. If it be mixed, colored, powdered, coated, or stained in a manner whereby damage or inferiority is concealed.

"Fifth. If it contain any added poisonous or other added deleterious ingredient which may render such article injurious to health: *Provided,* That when in the preparation of food products for shipment they are preserved by any external application applied in such manner that the preservative is necessarily removed mechanically, or by maceration in water, or otherwise, and directions for the removal of said preservative shall be printed on the covering or the package, the provisions of this Act shall be construed as applying only when said products are ready for consumption.

"Sixth. If it consists in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter."

contain no unwholesome added ingredient to disclose their trade formulas, except in so far as the provisions of this Act may require to secure freedom from adulteration or misbranding." [1]

---

[1] Section 8 provides:

"Sec. 8. That the term 'misbranded,' as used herein, shall apply to all drugs, or articles of food, or articles which enter into the composition of food, the package or label of which shall bear any statement, design, or device regarding such article, or the ingredients or substances contained therein which shall be false or misleading in any particular, . . .

"That for the purposes of this Act an article shall also be deemed to be misbranded:

       *       *       *       *       *       *       *       *

"In the case of food:

"First. If it be an imitation of or offered for sale under the distinctive name of another article.

"Second. If it be labeled or branded so as to deceive or mislead the purchaser, or purport to be a foreign product when not so, or if the contents of the package as originally put up shall have been removed in whole or in part and other contents shall have been placed in such package, or if it fail to bear a statement on the label of the quantity or proportion of any morphine, opium, cocaine, heroin, alpha or beta eucaine, chloroform, cannabis indica, chloral hydrate, or acetanilide, or any derivative or preparation of any of such substances contained therein.

"Third. If in package form, and the contents are stated in terms of weight or measure, they are not plainly and correctly stated on the outside of the package.

"Fourth. If the package containing it or its label shall bear any statement, design, or device regarding the ingredients or the substances contained therein, which statement, design, or device shall be false or misleading in any particular: *Provided,* That an article of food which does not contain any added poisonous or deleterious ingredients shall not be deemed to be adulterated or misbranded in the following cases:

"First. In the case of mixtures or compounds which may be now or from time to time hereafter known as articles of food, under their own distinctive names, and not an imitation of or offered for sale under the distinctive name of another article, if the name be accompanied on the same label or brand with a statement of the place where said article has been manufactured or produced.

In support of the ruling below, emphasis is placed upon the general purpose of the Act which it is said was to prevent deception, rather than to protect the public health by prohibiting traffic in articles which might be determined to be deleterious. But a description of the purpose of the statute would be inadequate which failed to take account of the design to protect the public from lurking dangers caused by the introduction of harmful ingredients, or which assumed that this end was sought to be achieved by simply requiring certain disclosures. The statute is entitled "An Act for preventing the manufacture, sale, or transportation of adulterated or misbranded or poisonous or deleterious foods, drugs, medicines, and liquors," etc. In the case of confectionery, we find that it is to be deemed to be adulterated if it contains certain specified substances "or other ingredient deleterious or detrimental to health." So, under § 7, subdivision Sixth, there may be adulteration of food in case the article consists in whole or in part of "any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter." In *United States* v. *Lexington Mills Co.*, 232 U. S. 399, 409, it was said that "the statute upon its face shows that the primary purpose of Congress was to prevent injury to the public health by the sale and transporta-

"Second. In the case of articles labeled, branded, or tagged so as to plainly indicate that they are compounds, imitations, or blends, and the word 'compound,' 'imitation,' or 'blend,' as the case may be, is plainly stated on the package in which it is offered for sale: *Provided,* That the term blend as used herein shall be construed to mean a mixture of like substances, not excluding harmless coloring or flavoring ingredients used for the purpose of coloring and flavoring only: *And provided further,* That nothing in this Act shall be construed as requiring or compelling proprietors or manufacturers of proprietary foods which contain no unwholesome added ingredient to disclose their trade formulas, except in so far as the provisions of this Act may require to secure freedom from adulteration or misbranding."

tion in interstate commerce of misbranded and adulterated foods. The legislation, as against misbranding, intended to make it possible that the consumer should know that an article purchased was what it purported to be; that it might be bought for what it really was and not upon misrepresentations as to character and quality. As against adulteration, the statute was intended to protect the public health from possible injury by adding to articles of food consumption poisonous and deleterious substances which might render such articles injurious to the health of consumers." See also *United States* v. *Antikamnia Co.*, 231 U. S. 654, 665; H. R. Report, No. 2118, 59th Cong., 1st Sess., 6–9. It is true that in executing these purposes Congress has limited its prohibitions (*Savage* v. *Jones*, 225 U. S. 501, 529, 532) and has specifically defined what shall constitute adulteration or misbranding; but in determining the scope of specific provisions the purpose to protect the public health, as an important aim of the statute, must not be ignored.

Reading the provisions here in question in the light of the context, we observe:

(a) That the term 'adulteration' is used in a special sense. For example, the product of a diseased animal may not be adulterated in the ordinary or strict meaning of the word but by reason of its being that product the article is adulterated within the meaning of the Act. The statute with respect to 'adulteration' and 'misbranding' has its own glossary. We cannot, therefore, assume that simply because a prepared 'food' has its formula and distinctive name, it is not, as such, 'adulterated.' In the case of confectionery, it is plain that the article may be 'adulterated' although it is made in strict accordance with some formula and bears a fanciful trade name, if in fact it contains an 'ingredient deleterious or detrimental to health, or any vinous, malt or spirituous liquor or compound or narcotic drug.' And the context clearly indicates that

with respect to articles of food the ordinary meaning of 'adulteration' cannot be regarded as controlling.

(b) The provision in § 7, subdivision Fifth, assumes that the substance which renders the article injurious, and the introduction of which causes 'adulteration,' is an ingredient of the article. It must be an 'added' ingredient; but it is still· an ingredient. Component parts, or constituents, of the article which is the subject of the described traffic are thus not excluded but are included in the definition. The article referred to in subdivision Fifth is the article sought to be made an article of commerce,—the article which 'contains' the ingredient.

(c) 'Adulteration' is not to be confused with 'misbranding.' The fact that the provisions as to the latter require a statement of certain substances if contained in an article of food, in order to avoid 'misbranding' does not limit the explicit provisions of § 7 as to adulteration. Both provisions are operative. Had it been the intention of Congress to confine its definition of adulteration to the introduction of the particular substances specified in the section as to misbranding, it cannot be doubted that this would have been stated, but Congress gave a broader description of ingredients in defining 'adulteration.' It is 'any' added poisonous or 'other added deleterious ingredient,' provided it 'may render such article injurious to health.'·

(d) Proprietary foods, sold under distinctive names, are within the purview of the provision. Not only is 'food' defined as including articles used for food or drink 'whether simple, mixed or compound,' but the intention to ·include 'proprietary foods' sold under distinctive names is manifest from the provisos in § 8 which the claimant invokes. 'Mixtures or compounds' which satisfy the first paragraph of the proviso are not only 'articles of food,' but are to enjoy the stated immunity only in case they do ''not contain any added poisonous or deleterious

ingredients." By the concluding clause of § 8, it is provided that nothing in the Act shall be construed to require manufacturers of 'proprietary foods' to disclose 'their trade formulas' except in so far as the provisions of the Act 'may require to secure freedom from adulteration or misbranding,' and the immunity is conditioned upon the fact that such foods 'contain no unwholesome added ingredient.' Thus the statute contemplates that mixtures or compounds manufactured by those having trade formulas, and bearing distinctive names, may nevertheless contain 'added ingredients' which are poisonous or deleterious and may make the article injurious, and, if so, the article is not taken out of the condemnation of § 7, subdivision Fifth.

(e) Again, articles of food including 'proprietary foods' which fall within this condemnation are not saved because they were already on the market when the statute was passed. The Act makes no such distinction; and it is to be observed that the proviso of § 8 explicitly refers to 'mixtures or compounds which may be now or from time to time hereafter known as articles of food.' Nor does the length of the period covered by the traffic, or its extent, affect the question if the article is in fact adulterated within the meaning of the Act.

Having these considerations in mind we deem it to be clear that, whatever difficulties there may be in construing the provision, the claimant's argument proves far too much. We are not now dealing with the question whether the caffeine did, or might, render the article in question injurious; that is a separate inquiry. The fundamental contention of the claimant, as we have seen, is that a constituent of a food product having a distinctive name cannot be an 'added' ingredient. In such case, the standard is said to be the food product itself which the name designates. It must be, it is urged, this 'finished product' that is 'adulterated.' In that view, there would

seem to be no escape from the conclusion that however
poisonous or deleterious the introduced ingredient might
be, and however injurious its effect, if it be made a con-
stituent of a product having its own distinctive name it is
not within the provision. If this were so, the statute would
be reduced to an absurdity. Manufacturers would be
free, for example, to put arsenic or strychnine or other
poisonous or deleterious ingredients with an unquestioned
injurious effect into compound articles of food, provided
the compound were made according to formula and sold
under some fanciful name which would be distinctive.
When challenged upon the ground that the poison was
an 'added' ingredient, the answer would be that without
it the so-called food product would not be the product
described by the name. Further, if an article purporting
to be an ordinary food product sold under its ordinary
name were condemned because of some added deleterious
ingredient, it would be difficult to see why the same result
could not be attained with impunity by composing a
formula and giving a distinctive name to the article with
the criticized substance as a component part. We think
that an analysis of the statute shows such a construction
of the provision to be inadmissible. Certain incongrui-
ties may follow from any definition of the word 'added,'
but we cannot conclude that it was the intention of Con-
gress to afford immunity by the simple choice of a formula
and a name. It does not seem to us to be a reasonable
construction that in the case of 'proprietary foods' manu-
factured under secret formulas Congress was simply con-
cerned with additions to what such formulas might em-
brace. Undoubtedly, it was not desired needlessly to
embarrass manufacturers of 'proprietary foods' sold under
distinctive names, but it was not the purpose of the Act
to protect articles of this sort regardless of their char-
acter. Only such food products as contain 'no unwhole-
some added ingredient' are within the saving clause and

in using the words quoted we are satisfied that Congress did not make the proprietary article its own standard.

Equally extreme and inadmissible is the suggestion that where a 'proprietary food' would not be the same without the harmful ingredient, to eliminate the latter would constitute an 'adulteration' under § 7, subdivision Third, by the abstraction of a 'valuable constituent.' In that subdivision Congress evidently refers to articles of food which normally are not within the condemnation of the Act. Congress certainly did not intend that a poisonous or deleterious ingredient which made a proprietary food an enemy to the public health should be treated as a 'valuable constituent,' or to induce the continued use of such injurious ingredients by making their elimination an adulteration subject to the penalties of the statute.

It is apparent, however, that Congress in using the word 'added' had some distinction in view. In the Senate bill (for which the measure as adopted was a substitute) there was a separate clause relating to 'liquors,' providing that the article should be deemed to be adulterated if it contained "any added ingredient of a poisonous or deleterious character"; while in the case of food (which was defined as excluding liquors) the article was to be deemed to be 'adulterated' if it contained "any added poisonous or other ingredient which may render such article injurious to human health." Cong. Rec., 59th Cong., 1st Sess., Vol. 40, p. 897. In explaining the provision as to 'liquors,' Senator Heyburn, the chairman of the Senate Committee having the bill in charge, stated to the Senate (*Id.*, p. 2647): "The word 'added,' after very mature consideration by your committee, was adopted because of the fact that there is to be found in nature's products as she produces them, poisonous substances to be determined by analysis. Nature has so combined them that they are not a danger or an evil—that is, so long as they are left in

the chemical connection in which nature has organized them; but when they are extracted by the artificial processes of chemistry they become a poison. You can extract poison from grain or its products and when it is extracted it is a deadly poison; but if you leave that poison as nature embodied it in the original substances it is not a dangerous poison or an active agency of poison at all.—So, in order to avoid the threat that those who produce a perfectly legitimate article from a natural product might be held liable because the product contained nature's poison it was thought sufficient to provide against the adding of any new substance that was in itself a poison, and thus emphasizing the evils of existing conditions in nature's product. That is the reason the word 'added' is in the bill. Fusel oil is a poison. If you extract it, it becomes a single active agency of destruction, but allow it to remain in the combination where nature has placed it, and, while it is nominally a poison, it is a harmless one, or comparatively so." For the Senate bill, the House of Representatives substituted a measure which had the particular provisions now under consideration in substantially the same form in which they were finally enacted into law. (Section 7, subd. Fifth; § 8, subd. Fourth, provisos.) And the Committee of the House of Representatives in reporting this substituted measure said (H. R. Report, No. 2118, 59th Cong., 1st Sess., pp. 6, 7, 11): "The purpose of the pending measure is not to compel people to consume particular kinds of foods. It is not to compel manufacturers to produce particular kinds or grades of foods. One of the principal objects of the bill is to prohibit in the manufacture of foods intended for interstate commerce the addition of foreign substances poisonous or deleterious to health. The bill does not relate to any natural constituents of food products which are placed in the foods by nature itself. It is well known that in many kinds of foods in their natural state some quantity of poisonous

or deleterious ingredients exist. How far these substances may be deleterious to health when the food articles containing them are consumed may be a subject of dispute between the scientists, but the bill reported does not in any way consider that question. If, however, poisonous or deleterious substances are added by man to the food product, then the bill declares the article to be adulterated and forbids interstate traffic."

This statement throws light upon the intention of Congress. Illustrations are given to show possible incongruous results of the test, but they do not outweigh this deliberate declaration of purpose; nor do we find in the subsequent legislative history of the substituted measure containing the provision any opposing statement as to the significance of the phrase. It must also be noted that some of the illustrations which are given lose their force when it is remembered that the statutory ban (§ 7, subd. Fifth) by its explicit terms only applies where the added ingredient may render the article injurious to health. See *United States* v. *Lexington Mills Co.*, 232 U. S. 399, *supra*. It is urged, that whatever may be said of natural food products, or simple food products, to which some addition is made, a 'proprietary food' must necessarily be 'something else than the simple or natural article'; that it is an 'artificial preparation.' It is insisted that every ingredient in such a compound cannot be deemed to be an 'added' ingredient. But this argument, and the others that are advanced, do not compel the adoption of the asserted alternative as to the saving efficacy of the formula. Nor can we accept the view that the word 'added' should be taken as referring to the quantity of the ingredient used. It is added ingredient which the statute describes, not added quantity of the ingredient, although of course quantity may be highly important in determining whether the ingredient may render the article harmful, and experience in the use of ordinary articles of

food may be of greatest value in dealing with such questions of fact.

Congress, we think, referred to ingredients artificially introduced; these it described as 'added.' The addition might be made to a natural food product or to a compound. If the ingredient thus introduced was of the character and had the effect described, it was to make no difference whether the resulting mixture or combination was or was not called by a new name or did or did not constitute a proprietary food. It is said that the preparation might be 'entirely new.' But Congress might well suppose that novelty would probably be sought by the use of such ingredients, and that this would constitute a means of deception and a menace to health from which the public should be protected. It may also have been supposed that, ordinarily, familiar food bases would be used for this purpose. But, however, the compound purporting to be an article of food might be made up, we think that it was the intention of Congress that the artificial introduction of ingredients of a poisonous or deleterious character which might render the article injurious to health should cause the prohibition of the statute to attach.

In the present case, the article belongs to a familiar group; it is a syrup. It was originally called 'Coca Cola Syrup and Extract.' It is produced by melting sugar,— the analysis showing that 52.64 per cent. of the product is sugar and 42.63 per cent. is water. Into the syrup thus formed by boiling the sugar, there are introduced coloring, flavoring, and other ingredients, in order to give the syrup a distinctive character. The caffeine, as has been said, is introduced in the second or third 'melting.' We see no escape from the conclusion that it is an 'added' ingredient within the meaning of the statute.

Upon the remaining question whether the caffeine was a poisonous or deleterious ingredient which might render the article injurious to health, there was a decided conflict

of competent evidence. The Government's experts gave testimony to the effect that it was, and the claimant introduced evidence to show the contrary. It is sufficient to say that the question was plainly one of fact which was for the consideration of the jury. See *443 Cans of Egg Product*, 226 U. S. 172, 183.

Second. As to '*misbranding*.' In the second count it was charged that the expression 'Coca Cola' represented the presence in the product of the substances coca and cola and that it contained "no coca and little if any cola." So far as 'cola' was concerned, the charge was vague and indefinite and this seems to have been conceded by the Government at the beginning of the trial. With respect to 'coca,' there was evidence on the part of the Government tending to show that there was nothing in the product obtained from the leaves of the coca plant, while on behalf of the claimant it was testified that the material called 'Merchandise No. 5' (one of the ingredients) was obtained from both coca leaves and cola nuts. It was assumed on the motion for a peremptory instruction that there might be a disputed question of fact as to whether the use of the word 'coca' is to be regarded "intrinsically and originally" as stating or suggesting the presence of "some material element or quality" derived from coca leaves, and it was also assumed that the evidence might be deemed to be conflicting with respect to. the question whether the product actually contained anything so derived. 191 Fed. Rep. pp. 438, 439. But these issues of fact were considered not to be material. On this branch of the case, the claimant succeeded upon the ground that its article was within the protection of the proviso in § 8 as one known 'under its own distinctive name.' 215 Fed. Rep. p. 544.

Section 8 (*ante*, p. 275), in its Fourth specification as to 'food,' provides that the article shall be deemed to be 'misbranded' "if the package containing it or its label shall

bear any statement, design, or device regarding the ingre-
dients or the substances contained therein, which  .  .  .
shall be false or misleading in any particular." Then
follows the proviso in question that an article not con-
taining any added poisonous or deleterious ingredients
"shall not be deemed to be  .  .  .  misbranded" in
the case of "mixtures or compounds which may be now
or from time to time hereafter known as articles of food,
under their own distinctive names, and not an imitation
of or offered for sale under the distinctive name of another
article," if the name is accompanied with a statement of
the place where the article has been produced.[1]

A distinctive name is a name that distinguishes. It
may be a name in common use as a generic name, e. g.,

---

[1] Among the departmental regulations (adopted in October, 1906,
pursuant to § 3, for the enforcement of the Act) is Regulation 20 with
respect to 'distinctive names' under § 8, as follows:

" (a) A 'distinctive name' is a trade, arbitrary, or fancy name which
clearly distinguishes a food product, mixture, or compound from any
other food product, mixture, or compound.

"(b) A distinctive name shall not be one representing any single
constituent of a mixture or compound.

"(c) A distinctive name shall not misrepresent any property or
quality of a mixture or compound.

"(d) A distinctive name shall give no false indication of origin,
character, or place of manufacture, nor lead the purchaser to suppose
that it is any other food or drug product."

Regulation 27 is as follows:

"(a) The terms 'mixtures' and 'compounds' are interchangeable
and indicate the results of putting together two or more food products.

"(b) These mixtures or compounds shall not be imitations of other
articles, whether simple, mixt, or compound, or offered for sale under
the name of other articles. They shall bear a distinctive name and
the name of the place where the mixture or compound has been manu-
factured or produced.

"(c) If the name of the place be one which is found in different
States, Territories, or countries, the name of the State, Territory, or
country, as well as the name of the place, must be stated."

coffee, flour, etc.   Where there is a trade description of this sort by which a product of a given kind is distinctively known to the public, it matters not that the name had originally a different significance.   Thus, soda-water is a familiar trade description of an article which now, as is well known, rarely contains soda in any form.   Such a name is not to be deemed either 'misleading' or 'false,' as it is in fact distinctive.   But unless the name is truly distinctive, the immunity cannot be enjoyed; it does not extend to a case where an article is offered for sale 'under the distinctive name of another article.'   Thus, that which is not coffee, or is an imitation of coffee, cannot be sold as coffee; and it would not be protected by being called "X's Coffee."   Similarly, that which is not lemon extract could not obtain immunity by being sold under the name of "Y's Lemon Extract."   The name so used is not 'distinctive' as it does not appropriately distinguish the product; it is an effort to trade under the name of an article of a different sort.   So, with respect to 'mixtures or compounds,' we think that the term 'another article' in the proviso embraces different compounds from the compound in question.   The aim of the statute is to prevent deception, and that which appropriately describes a different compound cannot secure protection as a 'distinctive name.'

A 'distinctive name' may also, of course, be purely arbitrary or fanciful and thus, being the trade description of the particular thing, may satisfy the statute, provided the name has not already been appropriated for something else so that its use would tend to deceive.

If, in the present case, the article had been named 'Coca' and it were found that the name was actually descriptive in the sense that it fairly implied that the article was derived from the leaves of the coca plant, it could not be said that this was 'its own distinctive name' if in fact it contained nothing so derived.   The

name, if thus descriptive, would import a different product from the one to which it was actually affixed. And, in the case supposed, the name would not become the 'distinctive name' of a product without any coca ingredient unless in popular acceptation it came to be regarded as identifying a product known to be of that character. It would follow that the mere sale of the product under the name 'Coca,' and the fact that this was used as a trade designation of the product, would not suffice to show that it had ceased to have its original significance if it did not appear that it had become known to the public that the article contained nothing derived from coca. Until such knowledge could be attributed to the public the name would naturally continue to be descriptive in the original sense. Nor would it be controlling that at the time of the adoption of the name the coca plant was known only to foreigners and scientists, for if the name had appropriate reference to that plant and to substances derived therefrom, its use would primarily be taken in that sense by those who did know or who took pains to inform themselves of its meaning. Mere ignorance on the part of others as to the nature of the composition would not change the descriptive character of the designation. The same conclusion would be reached if the single name 'Cola' had been used as the name of the product, and it were found that in fact the name imported that the product was obtained from the cola nut. The name would not be the distinctive name of a product not so derived until in usage it achieved that secondary significance.

We are thus brought to the question whether if the names coca and cola were respectively descriptive, as the Government contends, a combination of the two names constituted a 'distinctive name' within the protection of the proviso in case either of the described ingredients was absent. It is said that 'coca' indicates one

article, and 'cola' another, but that the two names to-
gether did not constitute the distinctive name of any other
substance or combination of substances. The contention
leads far. To take the illustration suggested in argument,
it would permit a manufacturer, who could not use the
name chocolate to describe that which was not chocolate,
or vanilla to describe that which was not vanilla, to desig-
nate a mixture as 'Chocolate-Vanilla,' although it was
destitute of either or both, provided the combined name
had not been previously used. We think that the con-
tention misses the point of the proviso. A mixture or
compound may have a name descriptive of its ingredients
or an arbitrary name. The latter (if not already appropri-
ated) being arbitrary, designates the particular product.
Names, however, which are merely descriptive of ingre-
dients are not primarily distinctive names save as they
appropriately describe the compound with such ingredi-
ents. To call the compound by a name descriptive of
ingredients which are not present is not to give it 'its
own distinctive name'—which distinguishes it from other
compounds—but to give it the name of a different com-
pound. That, in our judgment, is not protected by the
proviso, unless the name has achieved a secondary signifi-
cance as descriptive of a product known to be destitute
of the ingredients indicated by its primary meaning.

In the present case we are of opinion that it could not
be said as matter of law that the name was not primarily
descriptive of a compound with coca and cola ingredients,
as charged. Nor is there basis for the conclusion that the
designation had attained a secondary meaning as the
name of a compound from which either coca or cola in-
gredients were known to be absent; the claimant has
always insisted, and now insists, that its product contains
both. But if the name was found to be descriptive, as
charged, there was clearly a conflict of evidence with
respect to the presence of any coca ingredient. We con-

clude that the court erred in directing a verdict on the second count.

The judgment is reversed and the cause is remanded for further proceedings in conformity with this opinion.

*It is so ordered.*

MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of this case.