SEABROOK INTERNATIONAL FOODS, INC. et al., Plaintiffs,

v.

Patricia Roberts HARRIS et al., Defendants.

Civ. A. No. 80–0202.

United States District Court, District of Columbia.

Nov. 14, 1980.

Robert T. Lasky, Joseph A. Artabane, Jerome A. Madden, Washington, D. C., for plaintiffs.

Patricia J. Kenney, Asst. U. S. Atty., Washington, D. C., for defendants.

OBERDORFER, District Judge.

## MEMORANDUM

Plaintiffs in this action, three corporations in the business of importing seafood, seek injunctive and declaratory relief from a decision of the Food and Drug Administration ("FDA") refusing to admit into the United States three lots of raw, frozen shrimp offered for import. Plaintiffs claim that this decision was erroneous because (1) it was not supported by a sufficient factual basis in the record; (2) it was based upon

an incorrect legal interpretation of the import provisions of the Federal Food, Drug and Cosmetic Act ("the Act"), 21 U.S.C. § 342(a), § 381(a); and (3) it unfairly singles out raw shrimp for regulation while permitting red meat and poultry to be unregulated for salmonella contamination. Defendants subsequently filed a motion to dismiss or, in the alternative, for summary judgment. Plaintiffs filed an opposition to those motions and a cross motion for summary judgment. On October 31, 1980, the court entered an order granting defendants' motion for summary judgment and denying plaintiffs' cross motion, for reasons to be stated more fully in a memorandum to be filed. This is that memorandum.

## I.

The underlying facts are undisputed. FDA offices began in December, 1978, to observe the frequent presence of salmonella in shrimp imported from India. In February, 1979, the Los Angeles District Office of the FDA reported that 52 of 59 samples of Indian shrimp contained salmonella. As a result of this report, the FDA started to compile all salmonella analyses of Indian shrimp offered for import for the period October, 1978, to February, 1979. This compilation revealed that 28% of the lots sampled contained salmonella. A recommendation was consequently made to "blocklist," (i. e. automatically detain) all raw, frozen shrimp from India. See Hile Statement ¶¶ 5, 6, Tab 1, Defendants' Exhibit B. In an attempt to forestall blocklisting, Indian government and trade officials had meetings with FDA officials in which they acknowledged that the salmonella in Indian shrimp had been caused by improper handling and insanitary practices within some of their processing facilities, see id. ¶ 8, Tab. 2. They requested, on February 28, 1979, that the FDA defer blocklisting because the Indian government had begun a new sanitation program for the shrimp industry, and they invited FDA representatives to India to observe these improvements. Id. ¶ 9, Tab 2. As a result, the FDA authorized the sending of a delegation to India and deferred blocklisting, deciding instead to sample Indian shrimp offered for import on a 100% basis. Id. ¶ 10.

An FDA delegation travelled to India between May 30 and June 8, 1979. Although Indian authorities severely restricted access to work areas, the delegation was nevertheless able to observe a number of objectionable conditions. At the shrimp processing facilities, the delegation observed unscreened, fly–infested processing areas; inadequate icing of shrimp subjected to temperatures in excess of 90° F.; the placement of porous shrimp–holding pans on heavily–travelled floors; and the use of pitted and cracked work surfaces covered with the residue of fecal matter from previously processed frogs. At a shrimp landing area, FDA officials observed hundreds of people, mostly barefoot and dressed in soiled clothing, milling around the dock where the shrimp were unloaded; poor icing of shrimp; and the use of bamboo baskets, which are virtually impossible to sanitize, to collect shrimp. See Roy Statement ¶ 8, Defendants Exhibit A. Following this visit, on August 24, 1979, the FDA decided to blocklist all Indian shrimp offered for import.

Plaintiffs offered their three lots of frozen, raw Indian shrimp for import into the United States in April and May of 1979. FDA investigators collected samples from the three lots and upon examination found the presence of salmonella in each. See Gerstenberg Statement ¶ 4, Defendants' Exhibit C. The importers were all issued a Notice of Detention and Hearing, which stated that the shrimp violated § 381(a) of the Act because it "appears to contain a poisonous or deleterious substance (Salmonella species)." The Notice advised the importers that they had the "opportunity to appear ... to introduce testimony relative to the admissibility of the article." The Notice further advised that the importers could submit proposals for bringing the article into compliance with the Act. See Defendants' Exhibit 17.

A hearing, requested by plaintiffs pursuant to 21 U.S.C. § 381(a) was held on September 19, 1979, in the FDA offices in Brooklyn, New York, concerning the admissibility of the shrimp into the United States. The importers, afforded the opportunity to submit evidence, offered the testimony of Dr. John Silliker, an expert witness, and numerous exhibits. Dr. Silliker said, among other things, that salmonella in shrimp is not necessarily caused by human intervention. See Plaintiffs' Exhibit 3 at 21. The importers did not, however, offer any evidence at the hearing, or subsequently, to show that the lots of shrimp were not contaminated with salmonella. In their memorandum in support of their summary judgment motion, they state that they "do not challenge the FDA's finding that salmonella exist in the raw, frozen shrimp". See Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' Motion to Dismiss or in the Alternative, for Summary Judgment ("Plaintiffs' Memo") at 13.

On November 15, 1979, the FDA issued a Notice of Refusal of Admission to each of the importers (Plaintiffs' Exhibit 7). The FDA's statement of reasons for refusing admission of plaintiffs' shrimp are contained in the following sworn affidavits submitted to the court: [1]

1. The statement of Caesar A. Roy, Regional Food and Drug Director, Region II, of the FDA, who is responsible for the development, monitoring and assessment of all policy decisions implemented by FDA. He was a member of the FDA delegation which observed the shrimp landing areas and processing facilities in India. His affidavit contains a detailed report of his observations.

2. The statement of Joseph P. Hile, Associate Commissioner for Regulatory Affairs of the FDA, who is responsible for the development and implementation of the regulatory policies adopted by the agency. He participated personally in numerous meetings connected with this controversy and also reviewed other official agency records. His affidavit narrates the discovery of salmonella in Indian shrimp prior to the blocklisting and also details the policy reasons for blocklisting shrimp. Specifically, he notes the facts that salmonella in shrimp is almost always attributable to insanitary processing procedures and therefore can be avoided by proper processing; that, by contrast, salmonella often occurs naturally in red meat and poultry, and is therefore difficult to eradicate prior to cooking; that FDA must regulate imports heavily because it is unable to regulate the processing facilities abroad; and that the economic loss blocklisting may cause importers is far outweighed by the public health concern which justifies these actions.

3. The statement of George J. Gerstenberg, Director, New York District, Region II, of the FDA, who supervises the day-to-day enforcement of the Act in New York. This statement, based on

---

1. These affidavits of individuals involved in the FDA decisions about the factors before them at the time may properly be considered by the court as part of the administrative record in this case. The Supreme Court has indicated that a reviewing court may properly receive in evidence testimony of persons involved in agency actions for the purpose of explaining those actions. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419–420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). Indeed, taking such testimony into evidence may be necessary, since the Supreme Court has held that review of informal adjudication, as in this case, must be based on the full record before the agency at the time the agency decision was made, even though a formal record may not exist, since there is no requirement under the Administrative Procedure Act that a record be compiled in informal adjudications. Citizens to Preserve Overton Park v. Volpe, supra, 401 U.S. at 420, 91 S.Ct. at 825; compare 5 U.S.C. §§ 554, 556. Although the Supreme Court has offered no firm guidelines on how to proceed in the absence of an existing administrative record, one proper course in reviewing informal adjudication is to examine agency reasons, as contained in affidavits submitted to the court, for the decision under review. See Dunlop v. Bachowski, 421 U.S. 560, 572–73, 95 S.Ct. 1851, 1860, 44 L.Ed.2d 377 (1975). It should, moreover, be noted that plaintiffs at oral argument waived any objection to the court's consideration of the affidavit material on review.

the official records of the FDA, recites in detail the events surrounding the detention of the three batches of shrimp.

4. The statement of John W. Hardy, Chief of the Microbiology Branch, New York Regional Laboratory of the FDA, who avers that he supervised the examination of the samples of the three batches of shrimp and that salmonella was found in each sample.

5. The statement of Ralston B. Read, the Acting Director of the Division of Microbiology, Bureau of Foods, of the FDA, who has been involved in research on salmonella for 24 years and who has concluded from this research and from the evidence relating to the detention of Indian shrimp, that salmonella is not inherent in shrimp, but introduced by some other cause and may be injurious to health.

6. The statement of Taylor M. Quinn, Associate Director for Compliance, Bureau of Foods, of the FDA, who participated in the formulation of the agency's regulatory policy with respect to salmonella contaminated foods, and who reviewed the documents and testimony offered by the importers in this case. He relates that this evidence, combined with the results of FDA analyses of plaintiffs' three lots of shrimp and with the information reflected in Mr. Hile's statement, indicated that the three lots of shrimp violated § 381(a) of the Act.

## II.

### A.

■ The court has jurisdiction to review the FDA's decision. The Supreme Court has held that administrative actions are unreviewable only in those rare circumstances where there is "clear and convincing evidence of an intent to withhold (review)." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 n.2, 87 S.Ct. 1507, 1510 n.2, 18 L.Ed.2d 681 (1967); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). No such intent is evidenced in the relevant sections of the Act.

■ While the FDA's decision must be reversed if it was based upon an error of law in interpreting the relevant statutory provisions or was otherwise arbitrary and capricious, the court concludes that the FDA's application of law to the facts of this case was neither arbitrary nor an abuse of discretion. Deference must be accorded the FDA in its decision whether to allow the admission of specific articles for import. *See, e. g., Sugarman v. Forbragd*, 405 F.2d 1189 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2103, 23 L.Ed.2d 747 (1969).

### B.

■ The record is not, as plaintiffs assert, *see* Plaintiffs' Memo at 11–15, insufficient to support defendants' actions. Defendants offered plaintiffs all the procedural safeguards that are mandated by the Act and this action was not impermissibly arbitrary and capricious so as to violate plaintiffs' constitutional rights. Section 381(a) of the Act governs the procedure required for refusing the admission of articles for import. It states in relevant part that:

> The Secretary of the Treasury shall deliver to the Secretary of Health, Education, and Welfare, upon his request, samples of food, drugs, devices, and cosmetics which are being imported or offered for import into the United States, giving notice thereof to the owner or consignee, who may appear before the Secretary of Health, Education, and Welfare and have the right to introduce testimony .... If it appears from the examination of such samples or otherwise that ... such article is adulterated .... then such article shall be refused admission ....

It thus authorizes refusal upon the mere appearance of adulteration. It does not, in contrast to § 334(a), pertaining to domestic articles, mandate any condemnation procedure in a federal district court prior to seizure. Section 381(a) authorizes the Secretary of the Treasury to refuse admission of an article, without the introduction of testimony or evidence, as long as that article "appears" to be adulterated. The use of

the term "appears" in the statute is a striking and clear indication of Congress' intent to forego formal procedural requirements. Thus, while the meaning of the word "adulterated" in § 381(a) is determined by the definition enunciated in § 342(a), neither that section, nor any other section, imposes any procedural duties on the FDA, beyond those delineated in § 381(a), for determining whether an article may be refused admission for import.[2]

### C.

Plaintiffs do not dispute that the three lots of shrimp in question contain salmonella. *See supra* at 3. They do argue, however, that the FDA erred in concluding that this shrimp was adulterated under the standards delineated in § 342(a). That section divides adulterants into two classes, those which are "added" and those which are "not . . . added," and provides different standards for each. When a food contains an "added" substance, it is adulterated if the substance *"may* render it injurious to health." (emphasis added). When the food contains a substance that is "not . . . added," the food is adulterated only if the substance would *"ordinarily* render it injurious to health" (emphasis added).

Defendants concede that the shrimp in question is not ordinarily injurious to health. They argue nevertheless that the shrimp should be excluded because the salmonella constitutes an "added substance" which "may render [the shrimp] injurious to health." *See* Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment ("Defendants' Memo") at 13–35. According to defendants, the word "added" as used in the statute, refers to any substance that is not an inherent, essential component of the food. *See* Defendants' Memo at 14. Defendants cite many opinions in arguing that, with few exceptions, courts have applied this definition in interpreting the stat-

ute. According to plaintiffs, on the other hand, the word "added" as used in the statute refers only to a substance that is added by man. Citing *United States v. Forty Barrels Coca Cola*, 241 U.S. 265, 36 S.Ct. 573, 60 L.Ed. 995 (1916) and *United States v. Anderson Seafoods, Inc.*, 447 F.Supp. 1151 (N.D.Fla., 1978), which has since been affirmed on appeal, 622 F.2d 157 (5th Cir. 1980), they go on to argue that defendants have not established that man introduced salmonella to this shrimp. Since salmonella does not "ordinarily" render shrimp injurious to health, say plaintiffs, defendants may not lawfully exclude the shrimp.

The court need not decide which definition is ultimately the correct one because the defendants' action is lawful both under defendants' definition of "added" and under the more restrictive definition of that term propounded by plaintiffs. As Judge Wisdom, speaking for a Fifth Circuit panel, recently stated, a substance is "added," under the narrow definition, even if it derives in part from man and in part from nature. The Fifth Circuit held that "[s]ince the purpose of the 'may render injurious' standard was to facilitate regulation of food adulterated by acts of man, we think it should apply to all of a toxic substance present in a food when any of that substance is shown to have been introduced by man." *United States v. Anderson Seafoods, Inc., supra*, 622 F.2d at 161. Although salmonella may occur in nature, as plaintiffs assert, *see* Plaintiffs' Memo at 26, plaintiffs' own expert witness indicated that salmonella contamination may result from human intervention, *see* Plaintiffs' Exhibit 3 at 19, 35, and defendants' affidavits indicate that salmonella in shrimp is nearly always attributable to insanitary processing procedures. *See* Hile Statement ¶ 12(b), Defendants' Exhibit B; Read Statement ¶ 17, Defendants Exhibit J. Moreover, defendants had, as described earlier, *supra* at 2, specific

---

**2.** This interpretation does not mean, contrary to plaintiffs' suggestion, that defendants have "unfettered discretion to refuse admission on the basis of a cursory glance or a capricious

whim," Plaintiffs' Memo at 13. Defendants actions remain reviewable for abuse of discretion. *See infra* at 8–10.

evidence that Indian shrimp was contaminated because of human intervention. The FDA delegation's observation of the insanitary landing areas and packing procedures, combined with the general scientific observations on the nature of salmonella contamination in shrimp, provide an ample basis for the conclusion that the presence of salmonella in shrimp "appears" to be attributable to human intervention. Such a conclusion is clearly within defendants' scope of discretion since, under § 381(a), defendants do not carry the burden of proving the intervention of man; rather plaintiffs carry the burden of proving the contrary if they wish to overcome the conclusion that the shrimp appear to be contaminated.

It should, finally, be noted that *American Public Health Assn. v. Butz*, 511 F.2d 331 (D.C.Cir.1974), on which plaintiffs heavily rely, is not dispositive of the general issue whether salmonella is an added substance in shrimp. The court in that case held only that official Department of Agriculture inspection labels placed on raw meat and poultry products were not insufficient because they failed to warn of the dangers of salmonella and other bacteria. The issue called for a determination whether the USDA labelling procedures were adequate to safeguard consumers. The statement that "the presence of Salmonellae in meat does not constitute adulteration" within the meaning of the Wholesome Meat Act, *American Public Health Assn. v. Butz, supra*, 511 F.2d at 334, was plainly dictum which did not reflect consideration of any factual basis or legal analysis of the adulteration provision of that Act such as would make it applicable to the particular shrimp import at issue here. Moreover, there is a significant factual distinction between that case and the circumstances here. That case dealt with contamination of meat products and poultry alone. While salmonella may, as the Court of Appeals concluded, be inherent in raw meat and poultry, defendants point out that it is not, as a factual matter, inherent in raw shrimp. As noted above, *supra* at 9, this conclusion is reflected both in defendants' own affidavits and in the testimony of plaintiffs' expert witness. In

sum, the evidence submitted by both plaintiffs and defendants suggests that it was not an abuse of discretion to conclude that in shrimp, as distinguished from meat and poultry, salmonella is an added and not an inherent substance.

### D.

■ Plaintiffs further argue that, even if salmonella is an added substance in shrimp, it is not an adulterant within the meaning of § 381(a) because it does not meet the "may be injurious" to health standard as defined in *United States v. Lexington Mill & Elevator Co.*, 232 U.S. 399, 410–411, 34 S.Ct. 337, 340, 58 L.Ed. 658 (1914). This argument is not persuasive. This claim rests entirely upon the apparent absence of any reported instances of salmonellosis specifically attributable to shrimp, *see* Plaintiffs' Memo at 29. Defendants have shown in sufficient detail, however, that, *inter alia*, the low rate of shrimp consumption in the United States, as well as the limitation on government surveillance data on the occurrence of salmonella from this specific source, account for the low rate of reported cases. This absence of documentation does not foreclose the Administrator's discretion to determine that salmonella in shrimp may be injurious to the health of those who consume it. Moreover, defendants recite in detail the numerous studies which confirm the danger of salmonella as a pathogen, regardless of the food in which it is found. *See* Defendants' Memo at 26–30.

■ Plaintiffs' additional contention, that salmonella in shrimp does not meet the "may be injurious" standard, because normal cooking kills salmonella, *see* Plaintiffs' Memo at 30, is also not persuasive. Plaintiffs have neither proved nor seriously asserted that shrimp is universally cooked before humans consume it. And the evidence contained in defendants' affidavits indicates to the contrary that shrimp is consumed raw in this country. *See* Kanzaki Statement, Defendants' Exhibit L. Moreover, § 381(a) calls for refusal of admission of articles which "appear" adulterated at the

time when they are offered for import. It is not an adequate argument to claim that the adulteration will likely be corrected at some future time, after being admitted into the country. *See, e. g., United States v. 52 Drums Maple Syrup,* 110 F.2d 914 (2d Cir. 1940).

### E.

 Plaintiffs also argue that defendants have acted discriminatorily in singling out raw shrimp for regulation, while permitting red meat and poultry to go unregulated. Specifically, they argue that there is "no rationale" for this disparate treatment. *See* Plaintiffs' Memo at 34, *quoting* Plaintiffs' Exhibit 3 at 45. However, the defendants observe, *inter alia,* that foreign products must of necessity be regulated differently from domestic products, because foreign processing facilities cannot be inspected by U.S. authorities. *See* Defendants' Memo at 37; Hile Statement ¶ 12(c), Defendants' Exhibit B. This is a sufficient rationale to rebut this argument, especially in light of the long history of disparate treatment of imported goods, *see e. g., Sugarman v. Forbragd, supra,* and in light of the broad discretion agencies have in selecting the appropriate regulatory method to advance their prescribed objectives. *See, e. g., Pan American World Airways, Inc. v. Civil Aeronautics Board,* 392 F.2d 483, 496 (D.C.Cir.1968). This conclusion is made particularly comfortable here by the evidence about the unsavory condition of shrimp harvesting sites and shrimp packing facilities observed in India by FDA inspectors not long ago. Confronted with these observations, the Administrator was fully justified in concluding that the shrimp "appeared" adulterated and should be barred from export in the absence of any satisfactory showing by the importer that it was not harvested from or packed in the insanitary sites earlier observed by FDA inspectors in India.

For the foregoing reasons, the court earlier concluded that defendants' motion for summary judgment must be granted and that plaintiffs' motion for summary judgment must be denied.