UNITED STATES of America, Plaintiff,

v.

ANDERSON SEAFOODS, INC., a corporation and Charles F. Anderson, an Individual, Defendants.

ANDERSON SEAFOODS, INC., a corporation, and Charles F. Anderson, an Individual, Individually and on behalf of all persons similarly situated, Plaintiffs,

v.

Joseph A. CALIFANO, Jr., Secretary of Health, Education & Welfare, and Donald Kennedy, Commissioner of Food and Drugs, Defendants.

MCA Nos. 77–0215, 77–0218.

United States District Court, N. D. Florida, Marianna Division.

Feb. 8, 1978.

Nickolas P. Geeker, U. S. Atty., Pensacola, Fla., and Stephen D. Terman, Eric M. Blumberg, Food and Drug Administration, Rockville, Md., for plaintiff, the United States, in MCA No. 77–0215; and for defendants Califano, et al. in MCA No. 77–0218.

Alton O. Paulk, Panama City, Fla., and Robert T. Lasky, Joseph A. Artabane, Susan A. Elliott, Cadwalader, Wickersham & Taft, Washington, D. C., for plaintiffs, Anderson Seafoods, Inc., a corporation, and Charles F. Anderson, an individual, individually and on behalf of all persons similarly situated, in MCA No. 77–0218; and for defendants, Anderson Seafoods, Inc., et al. in MCA 77–0215.

Ronald A. Zumbrun, Raymond M. Momboisee, Pacific Legal Foundation, Sacramento, Cal., and Albert Ferri, Jr., Donald C. Simpson, Pacific Legal Foundation, Washington, D. C., for amicus curiae.

## MEMORANDUM DECISION

ARNOW, Chief Judge.

In early 1977, two related claims were filed in this court. On April 26 of that year, the United States brought suit against Anderson Seafoods, Inc., and Charles F. Anderson, its president (the "Enforcement Action"), No. MCA 77–0215. The United States claims that the defendants in that case have distributed fish which are "adulterated" within the meaning of section 402(a)(1) of the Food, Drug and Cosmetic Act ("Act"), 21 U.S.C. § 342(a)(1) (1975) and that they should be enjoined from further violating the Act. On May 11, 1975, Anderson Seafoods, Inc., and Charles F. Anderson filed a complaint for declaratory and injunctive relief on behalf of themselves and all others similarly situated [1] (the "Class Action"), No. MCA 77–0218. These two cases were consolidated and tried jointly because they shared fundamental questions of fact and law. For convenience, the plaintiff in the Enforcement Action and the defendants in the Class Action will be hereafter referred to as "FDA." The plaintiffs in the Class Action and the defendants in the Enforcement Action will be hereafter referred to as "Anderson."

In the Enforcement Action, FDA contends that swordfish distributed by Anderson are adulterated under the Act because they contain more than 0.5 ppm (parts per million) of mercury. In the Class Action, Anderson seeks a declaratory judgment that fish containing more than 0.5 ppm of mercury are not adulterated, even up to the level of 2.0 ppm. Anderson also seeks an injunction against FDA commensurate with the declaratory judgment.[2]

The Act provides in relevant part that food is deemed adulterated:

If it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health . . . .

21 U.S.C. § 342(a)(1) (1975). FDA presents no real contention that the swordfish in question are "ordinarily" injurious to health. Instead, the agency argues that mercury is an "added substance" in swordfish and that it "may render" the fish injuri-

---

1. The class is defined as all individuals in the United States engaged in or desiring to engage in the catching, selling, distributing or marketing of swordfish in interstate commerce. For purposes of this class definition, the term "individuals" includes natural persons, corporations, partnerships or other business entities.

2. Anderson also contended that FDA was required to establish a tolerance for mercury in swordfish under 21 U.S.C. § 346 (1975). The court ruled prior to trial that this contention was without merit.

ous. Anderson claims that mercury is not a substance which is added to swordfish and that the fish must be judged by the "ordinarily render . . . injurious" standard.

As the Act provides no definition of "added" or "added substance," the parties have offered interpretations of those terms which, not surprisingly, are quite different. FDA claims that an added substance is one that is not inherent or essential to the organism from which the food is derived. This would mean that nature's own contaminants are added under the Act's meaning. The agency relies on language used in certain court decisions and portions of the legislative history, but places greater emphasis on a very recent regulation in which it defined the statutory term "added substance." Anderson's position is that "added" means directly and proximately attributable to the acts of man. Its argument is based primarily on legislative history and its interpretation of the intent of Congress.

The legislative history supports Anderson's position. The distinction between added and non-added substances was established in the "adulterated food" provisions of the original Food, Drug and Cosmetic Act of 1906, ch. 3915, 34 Stat. 768 (current version at 21 U.S.C. § 342(a)(1) (1975)).[3] The history of that version of the Act identifies the distinction as that between acts of man and acts of nature. H.R.Rep.No.2118, 59th Cong., 1st Sess. 6, 7, 11 (1906) (quoted in *United States v. Coca Cola*, 241 U.S. 265, 282–83, 36 S.Ct. 573, 60 L.Ed. 995 (1915)) ("deleterious substances added by man"); 40 Cong.Rec. 1133 (Jan. 16, 1906) ("human

action") (remarks by Sen. Heyburn). The same distinction was also made in the legislative history of the present version of the Act. S.Rep.No.493, 73rd Cong., 2d Sess. 3 (1934) ("added by man or put there by nature . . . introduced by artifice or [occurring] naturally").

The Supreme Court made the same distinction in construing the "added . . . ingredient" provisions of the 1906 Act. *United States v. Coca Cola Co.*, 241 U.S. 265, 36 S.Ct. 573, 60 L.Ed. 995 (1915). Quoting legislative history including H.R.Rep. 2118, *supra*, the court stated:

> Congress, we think, referred to ingredients *artificially* introduced; these it described as 'added.' The addition might be made to a natural food product or to a compound . . . we think that it was the intention of Congress that the *artificial* introduction of ingredients of a poisonous or deleterious character which might render the article injurious to health should cause the prohibition of the statute to attach.

241 U.S. at 284, 36 S.Ct. at 579 (emphasis added).

FDA cites three cases subsequent to this decision which it contends support the agency interpretation. Two of the cases are circuit court decisions in which the courts use the word "inherent" when speaking of non-added substances under the Act. *Continental Chemiste Corp. v. Rukelshaus*, 461 F.2d 331, 337 (9th Cir. 1972); *Certified Color Ind. Committee v. Secretary of HEW*, 236 F.2d 866, 869 (2d Cir. 1956). The meaning of "added" was not an issue before

---

**3.** A food was deemed adulterated under § 7 (Fifth) of the 1906 Act "[i]f it contain[ed] any added poisonous or other added deleterious ingredient which may render such article injurious to health . . . .." This language was slightly revised in the present version of the Act, passed in 1938, to provide for the "ordinarily render . . . injurious" standard which applies to non-added substances. The word "added" and more importantly the distinction between added and non-added substances, however, remained a fundamental part of the statutory scheme. There can be no doubt that Congress intended "added" to have the same meaning in the 1938 Act as the word

had in the corresponding section of the 1906 Act. The change in terminology from "added ingredient" to "added substance" in the 1938 revision does not suggest that Congress intended the second phrase to have any different meaning. The terms "ingredient" and "substance" are used synonymously in the legislative history of the 1906 Act. *See* H.R.Rep.No. 2118, 59th Cong., 1st Sess. 6, 7, 11 (1906) (quoted in *United States v. Coca Cola*, 241 U.S. 265, 282–83 (1915)); 40 Cong.Rec. 2647 (1906) (remarks of Sen. Heyburn) (quoted in *United States v. Coca Cola*, 241 U.S. at 281–82, 36 S.Ct. 573).

either court, and neither court cited the *Coca Cola* decision. Moreover, the use of the word "inherent" is not necessarily inconsistent with the concept that non-added substances result from natural forces unaffected by the acts of man. The third case upon which FDA relies, again in which *Coca Cola* was not cited, stands for the proposition that any material obtained from the environment is an added substance. *United States v. An Article of Food Consisting of Cartons of Swordfish*, 395 F.Supp. 1184 (S.D.N.Y.1975). FDA has not urged this rather extreme position upon the court and the ruling, contrary to the legislative history of the Act and the language of the Supreme Court, is not persuasive authority.

■ FDA argues that its recently promulgated rule interpreting section 342(a)(1) is entitled to great deference. The rule in effect defines an added substance as one which is not "an inherent natural constituent of the food," but is rather the "result of environmental, agricultural, industrial, or other contamination."[4] 42 Fed.Reg. 52819 (1977) (to be codified at 21 C.F.R. § 109.3(c), (d)). Even the greatest of deference, however, would not require or permit a court to accept an interpretation contrary both to the legislative history and the language of the Supreme Court. The term "added" as used in section 342(a)(1) means artificially introduced, or attributable to the acts or intervention of man.

■ A preponderance of the evidence shows that some unquantified portion of the mercury in swordfish is attributable to the acts of man. Though Anderson claims that no mercury in swordfish can be attributed to artificial sources, its evidence on this matter consists largely of studies showing that man's mercury pollution may have had no substantial effect on the total level of mercury in several species of fish, including swordfish. The conclusion that man has not significantly affected the total level of mercury in swordfish, even if accepted, does not prove that man by his pollution has not achieved a share of that total. The evidence presented shows that the food supply is the primary if not the sole source of mercury in swordfish and that in the estuaries and shelf areas man contributes about two-thirds of the mercury found in the upper six to eight inches of sediment, which serves as the beginning of the swordfish's food chain. It is clear from the evidence that some portion of the mercury finding its way into swordfish comes from man's contribution to the food chain. That portion is an added substance under the Act.

■ A food is not adulterated within the meaning of the statute unless the added substance "may render it injurious to health." The word "may" connotes a reasonable possibility. It does not mean that a food may be prohibited absent absolute certainty that no one under the most extreme circumstances could be harmed. Nothing in the Act or legislative history suggests that Congress intended to proscribe a food simply because it was physically possible for one to consume enough of it to harm oneself. The Supreme Court has taken notice that a person could be harmed by ingesting a certain level of table salt, or even water. *Flemming v. Florida Citrus Exchange*, 358 U.S. 153, 163, 79 S.Ct. 160, 3 L.Ed.2d 188 (1958).

There is ample authority to support this interpretation. The primary decision on the matter is *United States v. Lexington Mill & Elevator Co.*, 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658 (1914). In that case the Supreme Court determined that in the context of the "may render . . . injurious" standard,

---

4. The rule reads in relevant part:

"(c) A 'naturally occurring poisonous or deleterious substance' is a poisonous or deleterious substance that is an inherent natural constituent of a food and is not the result of environmental, agricultural, industrial, or other contamination.

"(d) An 'added poisonous or deleterious substance' is a poisonous or deleterious substance

that is not a naturally occurring poisonous or deleterious substance. When a naturally occurring poisonous or deleterious substance is increased to abnormal levels through mishandling or other intervening acts, it is an added poisonous or deleterious substance to the extent of such increase.

"[t]he word 'may' is . . . . used in its ordinary and usual signification, there being nothing to show the intention of Congress to affix to it any other meaning." *Id.* at 411, 34 S.Ct. at 340. The Court further stated, "If it cannot by any possibility, when the facts are *reasonably considered*, injure the health of any consumer, [the food in question] though having a small addition of poisonous or deleterious ingredients, may not be condemned under the act." *Id.* (emphasis added.) In *Berger v. United States*, 200 F.2d 818, 821 (8th Cir. 1952), the *Lexington Mill* test was described as a standard of "reasonable possibility." Based on the Supreme Court's interpretation of section 342(a)(1), the *Berger* court interpreted the word "may" as used in section 342(a)(4) [5] to connote the same "reasonable possibility" standard. Consistent with the "reasonable possibility" interpretation of section 342(a)(1), the court in *Wood v. United States*, 286 F. 84 (7th Cir. 1923), found that soda was not adulterated by arsenic in light of the fact that one would have to consume 150,000 bottles of soda to achieve a doctor's "dose" of arsenic.

The evidence raises one other question concerning the "may render . . injurious" standard. Evidence was presented which seemed to show that man's contribution of mercury to the environment has not had a determinable impact on the total level of mercury in certain species of fish including swordfish. Though it may at first seem improper to conclude that one may "render" a food injurious if he merely substitutes a certain amount of substance for an equal amount of an identical naturally occurring substance, it would be contrary to the intent of Congress to exempt substitutions by man from the "may render . . injurious" standard. Taking the common example of caffeine in coffee, *see* Hearings on H.R. 6906, H.R. 8805, H.R. 8941, and S. 5. Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 74th Cong., 1st Sess. 58 (1935), if a coffee processor subjects coffee to a process in which the naturally occurring caffeine is removed and later replaced with an equal amount of identical caffeine, it seems clear that Congress would have the stricter health standard apply. From the legislative history it appears Congress felt man's activities were qualitatively different from the work of nature. *See, e. g.,* 40 Cong.Rec. 2647 *supra.*

Thus the question before the court is whether the mercury levels in the fish at issue in these two actions, to which levels man has contributed some unknown amount, pose a reasonable possibility of injury to anyone's health.[6] This question must be answered respecting, in the Class Action, swordfish sold generally and in the Enforcement Action swordfish which FDA shows were or will be distributed by defendant Anderson.

The Enforcement Action is brought on the basis of five samples taken from fish distributed by Anderson. One sample was lost before all tests were run. The four remaining samples were subjected to five tests which yielded varying results. Three tests run by FDA achieved fairly uniform results, but two tests run by independent laboratories achieved markedly different findings. The private laboratory commissioned by FDA reported levels of mercury which were unusually high compared with FDA's own results, and the laboratory commissioned by Anderson reported unusually low levels. Because of the uniformity of

---

5. 21 U.S.C. § 342(a)(4) (1975) provides that a food is deemed adulterated "if it has been prepared, packed, or held under unsanitary conditions whereby it *may* have become contaminated with filth . . .." (emphasis added.)

6. FDA contends it is not required to quantify the amount of mercury in swordfish added by man; Anderson has not opposed this contention. There is a question whether Congress intended that a food be deemed adulterated only when the amount of the substance added by man "may render" it injurious. It is not necessary to decide this question because of the court's conclusion respecting the potential injuriousness of the fish at issue in the Enforcement Action and because of Anderson's failure to quantify man's contribution to the fish at issue in the Class Action.

FDA's three test results and because the independent laboratories represent rather extreme results, this court adopts the average of FDA's three tests as the level of mercury in each respective sample. The court finds that Anderson's swordfish contains mercury at levels ranging from .53 ppm to 1.00 ppm.

## ANALYSIS IN PARTS PER MILLION

| SAMPLE NO. | 1st FDA Lab | 2nd FDA Lab | 3rd FDA Lab | FDA Private Lab | Anderson Private Lab | Average FDA Lab |
|---|---|---|---|---|---|---|
| 77–27–044 | 1.10 | .90 | .96 | 1.22 | .35 | .99 |
| 77–27–046 | .85 | .74 | .82 | .95 | .43 | .81 |
| 77–27–950 | .51 | .57 | .52 | 1.40 | .20 | .53 |
| 77–64–705 | .97 | 1.01 | 1.01 | 2.64 | 2.55 | 1.00 |

Thus the threshold question for FDA in the Enforcement Action is whether swordfish containing mercury at levels up to and including 1.0 ppm may be injurious to anyone's health.

Respecting the Class Action, the evidence demonstrates that swordfish containing up to and in excess of 2.0 ppm of mercury are distributed in this country. Anderson claims that swordfish containing 2.0 ppm or less pose no reasonable possibility of injury to anyone's health, and carries a commensurate burden of proof.

Experts, testifying, expressed widely divergent opinions and conclusions concerning the effect on health of mercury in fish. Each opinion was based, however, on the effects of methylmercury, the most toxic and common form of mercury found in swordfish. No evidence was presented concerning the possible effects of other forms of mercury. A preponderance of the evidence establishes that there is an acceptable human intake level for methylmercury; that is, a level which is safe but above which injury may occur. This level is determined by three factors:

(1) the minimum clinical effect level for methylmercury in the blood;

(2) the methylmercury intake necessary to reach that level; and

(3) the safety factor to be applied.

The minimum clinical effect level ("MCEL") is the lowest level of methylmercury in the blood at which a harmful effect upon human health can be detected. Although FDA asserts that there may be subclinical effects of methylmercury (harmful effects which cannot be detected by today's neurological examination), the evidence presented before the court is too speculative to support any determination respecting whether there may be injury below the MCEL, much less the mercury level at which there will be such an injury. The court thus finds that the MCEL is the lowest level of mercury at which human beings may be injured.

FDA argues that the MCEL is 0.2 ppm of methylmercury. This assertion is based on two cases of methylmercury poisoning which occurred at Niigata, Japan in 1965 (Case Nos. 18 and 30). The studies were conducted at that time using the dithizone method of analyzing blood and hair samples. This method has been called into question by results obtained from the use of the more modern atomic absorption method. The dithizone method has been shown to significantly understate mercury content. Furthermore, experts' reexamination of the two Niigata cases indicated that the blood levels in those cases were much higher than the original determination of 0.2 ppm.

Based on more recent studies in Iraq, Anderson's expert witnesses stated that the

MCEL is 0.4 ppm. While the Iraq studies were confined to field testing and involved group rather than individual data, they involved more modern testing techniques and a population subjected to a wider range of mercury doses. Anderson's witnesses and the Iraq research upon which they rely have shown by a preponderance of the evidence that the MCEL for methylmercury is 0.4 ppm.

The testimony was not clear as to the methodology used in determining the mercury intake necessary to achieve the MCEL. Anderson argued that the court should adopt methodology previously used by FDA, based on findings of the Swedish Commission on Evaluating the Toxicity of Mercury in Fish. Under that methodology, 300 mcg/day (micrograms per day) of methylmercury is presumed to yield a blood level of 0.2 ppm. Anderson argued by extrapolation that 600 mcg/day is required for a 0.4 ppm blood level. FDA's expert witness at trial, however, used the figure 200 mcg/day as the intake level necessary to reach the 0.2 ppm blood level. Noting that that figure did not yield the precise acceptable daily intake ("ADI") argued by FDA, the agency suggested after trial that their expert meant to use a figure of 210 mcg/day. The court has before it some explanation of the basis for the Swedish methodology. This methodology was used by Anderson's expert witnesses and is officially used by FDA. The agency has not suggested that this methodology should now be deemed improper. Dr. Lu's proposed methodology, or that which he meant to propose, comes without adequate explanation. The court finds that it should rely on the Swedish methodology. Extrapolating from this methodology the court finds that an intake of 600 mcg/day is necessary to reach the MCEL of 0.4 ppm.

There is disputed testimony over the proper safety factor to employ in determining the acceptable human intake level for methylmercury. The safety factor is a number which is divided into the methylmercury intake necessary to reach the MCEL to account for uncertainties in the data. FDA used a safety factor of ten in

its original methodology, but its expert at trial, Dr. Lu, testified that a factor of seven is sufficient. Anderson's experts found that a safety factor of five is now appropriate, given the new and superior data from the Iraq studies. On the evidence before it, the court concludes that five is the most reasonable and appropriate safety factor. That factor, applied to the methylmercury intake of 600 mcg/day (necessary to reach the 0.4 ppm MCEL), establishes, and the court finds, the ADI for methylmercury to be 120 mcg (600 ÷ 5). Converting this to a weekly intake, the acceptable weekly intake ("AWI") for methylmercury is 840 mcg.

The AWI for methylmercury must be converted to a figure for total mercury. One of Anderson's experts, Dr. Smith, testified that approximately 90% of all mercury in fish is methylmercury, and used that figure in his calculations. FDA experts reported that 90% or more of mercury in fish is methylmercury. Another of Anderson's witnesses, Dr. Guinn, said he could only conclude that methylmercury represents a very large portion of the total, based on some studies estimating the share to be 90% or more and other studies which placed the figure at approximately 70–80%. The court finds from a preponderance of the evidence that an average of approximately 90% of mercury in fish is methylmercury. This being so, the methylmercury AWI of 840 mcg represents only 90% of the AWI for total mercury in fish. This total mercury AWI is 933 mcg (840 ÷ 0.90). Having found this AWI, the court must determine whether there is a reasonable possibility that anyone will consume 933 mcg/wk of mercury in their fish diet.

The parties brought forward varied evidence on fish consumption by Americans. FDA offered evidence of the amounts of fish by weight which Americans may consume. The weight of fish consumed is meaningless, however, unless combined with the known mercury levels in the fish consumed. The only evidence of the actual levels of mercury consumed in fish diets

comes from the MECCA Study[7] and the Humphrey Study.[8]

In the MECCA Study, the fish consumption of a sample population of 4,864 persons, representative of the United States population, was monitored. The types of fish consumed were identified and the participants' mercury intake was predicted by multiplying the consumed weight of each type fish by the average mercury level found to exist in that type fish. Only family consumption was measured; individual consumption was estimated by dividing family totals by the numbers of individuals in each family. The maximum individual intake predicted by this study was 31.7 mcg/day, or 222 mcg/wk. Based on this prediction alone, no person could be expected to consume 933 mcg/wk of mercury. To consume that amount, one would have to consume enough fish, or sufficiently concentrate a diet among fish containing high levels of mercury, to consume 4.2 times the highest mercury consumption average predicted by the MECCA Survey. The study does not account, however, for the possibility of fish consumption at abnormal levels of mercury.

The Humphrey Study showed that certain Americans may consume fish which through man's pollution have achieved unnaturally high levels of mercury. In that study, conducted under the auspices of FDA, the fish consumption of sample population in Michigan was studied. The population consumed fish which contained an average of 1.0 ppm of mercury. This was five times above the MECCA Study's predicted average of 0.2 ppm due to the pollution of Lake Michigan and its tributaries. The highest fish consumption predicted for the population in the Humphrey Study was 157 g/day (1099 g/wk). This figure is less than the highest fish consumption (165 g/wk) found in the MECCA Study. Anderson's expert Dr. Margolin predicted that

based on the 1.0 ppm of mercury level the highest consumers represented by the Humphrey Study would achieve a mercury intake of 157 mcg/day (1099 mcg/wk). This is slightly (eighteen percent) higher than the 933 mcg AWI.

The Humphrey and MECCA Studies show by a preponderance of the evidence that there is no reasonable possibility of injury to anyone's health from the consumption of swordfish containing 1.0 ppm or less of mercury. The Humphrey Study, viewed in conjunction with the MECCA findings, represents the highest intake of mercury·from fish established by the evidence. In that study the maximum consumers (1099 g/wk) were predicted to exceed the AWI (933 mcg) because of the unusually high mercury average in the fish consumed. To protect these consumers, there must be a guideline which will reduce the average mercury level in the fish consumed to a point at which they will not exceed the AWI. The average must thus be reduced to 0.85 ppm (933 mcg/wk ÷ 1099 g/wk). Data from the MECCA Study shows that, if all swordfish containing in excess of 1.0 ppm of mercury were removed from the market, the mercury level in that type of fish would be reduced from an average of 1.10 ppm to an average of .80 ppm. Swordfish at this level of mercury could pose no danger to the population represented by the Humphrey Study since this level is slightly below the average mercury level of 0.85 ppm which that population must consume to reach the AWI. As swordfish containing 1.0 ppm or less of mercury pose no reasonable possibility of injury to anyone's health, they cannot be deemed adulterated within the meaning of section 342(a)(1).

▮ FDA has failed to meet its burden of proof in the Enforcement Action, No. MCA 77–0215. The fish tested in that case

7. Finch, Effects of Regulatory Guidelines on the Intake of Mercury from Fish—the MECCA Project, 71 Fishery Bulletin 615 (1973). "MECCA" is an acronym for Model for the Estimation of the Consumption of Contaminants from Aquatic Foods.

8. This study was related to the court by Dr. Margolin, one of Anderson's experts. No citation was provided for this source.

all contain 1.0 ppm or less of mercury. Fish containing those levels cannot be deemed adulterated within the meaning of section 342(a)(1). While it is possible that Anderson is distributing, or will distribute, swordfish containing mercury in excess of that level, such is not established by a preponderance of the evidence. FDA is therefore entitled to no relief. Judgment will be entered in favor of defendants and against plaintiff in that case, with the consent decree of preliminary injunction heretofore entered in this cause dissolved and the suit dismissed at plaintiff's cost.

In the Class Action, No. MCA 77–0218, Anderson has requested declaratory and injunctive relief. Anderson has not proved its claim that swordfish containing 2.0 ppm or less of mercury cannot be deemed adulterated under section 342(a)(1). On the evidence presented, however, Anderson is entitled to a declaration by the court that swordfish containing 1.0 ppm or less of mercury cannot be deemed adulterated under section 342(a)(1). Under 28 U.S.C. § 2201 (1975) such declaration may be made, whether or not further relief is or could be sought. Here Anderson seeks further relief by way of injunction. However, there is no evidence indicating FDA might ignore the judgments in these cases and again bring enforcement actions based on no more evidence than was here presented. The court will not assume that government officials will unreasonably exercise their statutory discretion and will not act in good faith. *See P. F. Petterson Baking Co. v. Bryan*, 290 U.S. 570, 54 S.Ct. 277, 78 L.Ed. 505 (1934). Furthermore, these decisions are based only on the scientific and empirical data accepted into evidence in these cases. It may be that further studies will reveal the decisions here made were based on erroneous or insufficient data. It is thus inappropriate to enjoin FDA.

In this action judgment will be entered declaring that on the evidence presented in this case swordfish containing 1.0 ppm or less of mercury cannot be deemed to be adulterated under the meaning of 21 U.S.C. § 342(a)(1) on the basis of their mercury content, and denying injunctive relief. Costs will be taxed against the defendants.