CONTINENTAL SEAFOODS,
INC., Appellants,

v.

Richard S. SCHWEIKER, Secretary of
Health and Human Services.

No. 80–2462.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 16, 1981.

Decided March 19, 1982.

---

Joseph A. Artabane, Washington, D. C., with whom Robert T. Lasky and Joseph Ingrisano, Washington, D. C., were on the brief, for appellants.

Eric M. Blumberg, Associate Chief Counsel, Food and Drug Administration, Rockville, Md., with whom Jeffrey B. Springer, Acting Chief Counsel, Food and Drug Administration, Rockville, Md., John J. Powers, III and Daniel J. Conway, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellees. Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the briefs were filed, Kenneth M. Raisler, Patricia J. Kenney and Royce C. Lamberth, Asst. U. S. Attys., Washington, D. C., also entered appearances, for appellees.

Before BAZELON, Senior Circuit Judge, and TAMM and EDWARDS, Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

We must decide whether the Food and Drug Administration (FDA) acted lawfully in concluding that Indian shrimp contaminated with poisonous bacteria was "adulterated" within the meaning of the Food,

Drug and Cosmetic Act (FDCA or Act). The district court answered yes. We affirm.

## I.

■ The Act permits the FDA to prohibit the importation of food that "appears" to be adulterated.[1] In defining "adulterated," the Act focuses on the origin and dangers of "poisonous or deleterious substance[s]" in the food.[2] When such substances are "added" to the food, the food is adulterated if the substance "*may* render it injurious to health."[3] When, on the other hand, the substance is not added, the food is considered adulterated only if the substance would "*ordinarily* render it injurious to health."[4]

Beginning in late 1978, the FDA observed that a significant proportion of shrimp arriving from India contained salmonella. Without proper cooking and storage, food containing that bacteria can cause salmonellosis, a communicable disease that produces a number of serious bodily impairments and sometimes results in death.[5] After officials of the Indian government acknowledged that insanitary processing facilities were responsible for the high rate of contamination of Indian shrimp, the FDA decided to sample all such shrimp arriving in the United States.[6]

In the spring of 1979, appellants offered two lots of raw, frozen Indian shrimp for import into the United States. The FDA sampled the shrimp and discovered salmonella in both lots. The importers each received a Notice of Detention and Hearing stating that the lots of shrimp would be refused admission because they "appear[ ] to contain a poisonous deleterious substance (*Salmonella* species)."[7] Appellants were afforded a hearing at which they tried to show that the shipments were not adulterated. After reviewing the evidence offered by the importers, the FDA issued a Notice of Refusal of Admission. The Notice said

---

**1.** Section 801(a) of the Act, 21 U.S.C. § 381(a) (1976) provides in pertinent part:

> The Secretary of Treasury shall deliver to the Secretary of Health, Education, and Welfare, upon his request, samples of food ... which are being imported or offered for import into the United States, giving notice thereof to the owner or consignee, who may appear before the Secretary of Health, Education, and Welfare and have the right to introduce testimony.... If it *appears* from the examination of such samples or otherwise that ... such article is adulterated ... then such article shall be refused admission ....

[Emphasis added.]

**2.** Section 402 of the Act, 21 U.S.C. § 342 (1976) provides:

> A food shall be deemed to be adulterated— (a)(1) If it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health....

**3.** 21 U.S.C. § 342(a)(1) (1976) (emphasis added). *See* note 2 *supra.*

**4.** 21 U.S.C. § 342(a)(1) (1976) (emphasis added). *See* note 2 *supra.*

**5.** The report of the *FDA Salmonella Task Force*, introduced in the record by the importers, described some of the effects of salmonellosis:

> The syndromes can be a diarrhea, a severe enteritis, a typhoidal picture (fever), septicemia and meningitis. In generalized infections the microorganism may localize in any tissue of the body, producing abscesses, endocarditis, pneumonia and kidney impairment.

Joint Appendix (J.A.) 81. According to one study, there are about 2,000,000 human cases of salmonellosis each year in the United States. The study calls the illness "one of the most important communicable disease problems in the United States today." National Academy of Sciences, An Evaluation of the Salmonella Problem (Report of the U.S. Dept. of Agriculture and the FDA) 6 (1969), *reprinted at* J.A. 71.

**6.** Unless otherwise noted, the facts are undisputed and are taken from the district court's opinion, *Seabrook International Foods, Inc. v. Harris*, 501 F.Supp. 1086, 1088–89 (D.D.C.1980) ("D.Ct.Op.").

**7.** The plaintiffs in the district court included a third importer, *Seabrook International Foods, Inc.*, whose lot of shrimp was seized at about the same time as appellants'. *See* J.A. 231. Seabrook has voluntarily dismissed its appeal.

that the shrimp appeared to be adulterated and ordered the lots destroyed unless they were exported within ninety days. Appellants received permission to retain the shrimp in frozen storage pending the outcome of this litigation.

In their complaint in the district court, appellants contended that the import prohibition (1) was based on an incorrect interpretation of the Act's standard for "adulterated," (2) was unsupported by evidence in the record, and (3) reflected discriminatory treatment of shrimp in comparison to other foods. Based on a review of affidavits, expert testimony, and prior authority,[8] the district court rejected all three arguments and granted summary judgment in favor of the FDA.

## II.

Appellants concede that the two lots of shrimp at issue contain salmonella. The FDA, in turn, acknowledges that salmonella is not "ordinarily injurious" since its dangers can be averted through proper cooking and storage. The only issue before us,[9] then, is whether the FDA properly concluded that the shrimp met the more relaxed standard of adulteration for "added" substances. Specifically, we must evaluate the FDA's determinations that (A) salmonella was "added" to the Indian shrimp, and (B) that the bacteria "may render" the shrimp unhealthy.[10]

### A. Is salmonella "added" to shrimp?

Appellants argue that this question was conclusively answered in the negative by our decision in *American Public Health Association v. Butz* ("*APHA*"), 511 F.2d 331 (D.C.Cir.1974). The plaintiffs in that case contended that inspection labels placed on domestic meat and poultry products by the Secretary of Agriculture were misleading since they failed to warn about the salmonella often found in those products. The court noted that inspection labels could be misleading under the Wholesome Meat Act if salmonella constituted adulteration within the meaning of that statute. Assuming that salmonella "may be inherent in the meat," the court commented: "[W]e think that the presence of salmonella in meat does not constitute adulteration within [the Wholesome Meat Acts'] definition." *Id.* at 334. Appellants claim this remark amounted to a judicial determination that salmonella does not adulterate food.

The observation in *APHA* on which appellants rely consists of dictum uttered in a different legal and factual context. The issue presented by that case was whether the inspection labels were misleading, not whether the food was adulterated. In upholding the Secretary, the court relied on its view that consumers understand the importance of proper storage and cooking of meat and poultry as well as its conclusion that Congress did not intend "microscopic examination[s]" of domestic food products by the Department of Agriculture. *Id.* at

---

**8.** In determining the basis for the FDA's actions, the district court relied on affidavits of officials involved in the decisionmaking. The importers did not object to this procedure or to the district court's examination of "the full record before the agency at the time the agency decision was made" in evaluating the informal adjudication at issue. D.Ct.Op. at 1089 n.1. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971).

**9.** Appellants do not challenge the propriety of the procedures employed by the FDA in reaching its decision. *See* D.Ct.Op. at 1090.

**10.** Appellants also argue that *APHA v. Butz, infra*, prohibits the FDA from singling out one type of food for regulation. *See* 511 F.2d at 333. The FDA's action here, they contend,

violated that prohibition by focusing only on imported shrimp. As we discuss below, however, *APHA* concerns the government's authority to label domestic products and not its power to ban foods offered for import. As the district court noted, "foreign products must of necessity be regulated differently from domestic products, because foreign processing facilities cannot be inspected by U.S. authorities." D.Ct.Op. at 1093. The FDA's action was within its long-established authority to treat imported goods differently from domestic ones. *Compare* 21 U.S.C. § 381(a) (1976), *supra* note 1, *with id.* § 334(a)(1) (requiring condemnation proceeding in district court before seizure of domestic foods). *See Sugarman v. Forbragd*, 405 F.2d 1189 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2103, 23 L.Ed.2d 747 (1969).

334–35. The court offered no evidentiary support for its additional suggestion that salmonella may not be "added" to meat. Moreover, the court's assumption about the inherent qualities of meat and poultry obviously do not bind the FDA's evaluation of shrimp.[11] Finally, while the statutes involved in *APHA* define adulteration in terms similar to the FDCA,[12] the government enjoys substantially greater discretion in preventing the import of apparently adulterated foods than it does in labelling domestic products.[13]

Accordingly, we must determine whether the FDA's conclusion that salmonella is an "added" substance in shrimp is consistent with the provisions of the FDCA. The parties urge different interpretations of the word "added." A regulation promulgated by the FDA in 1977 defines the word to include any substance that is not an inherent, natural constituent of the food.[14] Appellants, on the other hand, argue that "added" describes only those substances which are present due to human intervention. Citing cases that have employed that definition,[15] appellants contend that the

FDA was required to demonstrate that human intervention introduced salmonella to the shrimp at issue here. The district court declined to resolve this definitional dispute. Instead, the court held that the FDA could have deemed the salmonella "added" under either standard.

■ Appellants' contention that "added" refers only to substances introduced by humans was recently adopted by the Fifth Circuit in *United States v. Anderson Seafoods, Inc.*, 622 F.2d 157 (1980). The court there concluded that the more relaxed standard for adulteration "should apply to all of a toxic substance present in a food when any of that substance is shown to have been introduced by man." *Id.* at 161. The court further held that a showing of human intervention could be based on general scientific knowledge about the origin of the additive in question. *See id.* at 162. *Anderson Seafoods* thus implicitly rejected the notion advanced by appellants here that the FDA must demonstrate human intervention with respect to the particular articles of food it wishes to regulate. We reject the argument explicitly. In light of the FDA's

---

**11.** The relevant sections of the FDCA clearly contemplate a particularized inquiry into the type of food at issue and the nature and origin of the poisonous substance. *See* notes 1 & 2 *supra.* Courts must defer to the expertise of the agency charged with exercising Congress' broad power to bar articles from import. *See Sugarman v. Forbragd*, 405 F.2d 1189 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2103, 23 L.Ed.2d 747 (1969). *See also Board of Trustees of University of Illinois v. United States*, 289 U.S. 48, 57, 53 S.Ct. 509, 77 L.Ed. 1025 (1933).

**12.** *Compare* Poultry Products Act § 4, 21 U.S.C. § 453(g)(1) *and* Wholesome Meat Act § 1, 21 U.S.C. § 601(m)(1) *with* FDCA § 402, 21 U.S.C. § 342(a).

**13.** *See* note 10 & text accompanying note 1 *supra.*

**14.** The regulations define the relevant phrases in section 402 of the Act as follows:

(c) A "naturally occurring poisonous or deleterious substance" is a poisonous or deleterious substance that is an inherent natural constituent of a food and is not the result of environmental, agricultural, industrial, or other contamination.

(d) An "added poisonous or deleterious substance" is a poisonous or deleterious substance that is not a naturally occurring poisonous or deleterious substance. When a naturally occurring poisonous or deleterious substance is increased to abnormal levels through mishandling or other intervening acts, it is an added poisonous or deleterious substance to the extent of such increase. 21 C.F.R. § 109.3 (1977). The FDA states that under its "'inherent' test, a substance is 'added' to a food if its presence therein is attributable to man *or*, if the substance is not an inherent, natural constituent of the food." Brief for Appellees at 17 n.13 (emphasis in original). Since we conclude that the FDA has a sufficient basis for determining that salmonella is at least partly "attributable to man," we need not decide whether the agency could apply the more relaxed standard of adulteration to foods which contain dangerous substances due to unusual acts of nature. *See* p. 43 *infra.*

**15.** *E.g., United States v. Coca Cola Co. of Atlanta*, 241 U.S. 265, 284, 36 S.Ct. 573, 579, 60 L.Ed. 995 (1916); *United States v. Anderson Seafoods, Inc.*, 622 F.2d 157, 160 (5th Cir. 1980).

broad authority to prohibit import of any food that "appears" to be adulterated, the agency need not prove that substances present in a particular lot were introduced by man.[16]

■ We agree with the district court that the FDA's decision in this case satisfied appellants' definition of "added" as elaborated in *Anderson Seafoods.* The evidence offered by both parties indicated that salmonella in shrimp can result from human acts and can frequently be attributed to insanitary processing procedures.[17] The FDA had ample reason to believe that the salmonella frequently observed in Indian shrimp in 1978 and 1979 resulted from insanitary conditions. Representatives of the Indian government acknowledged to the FDA that the salmonella contamination was a result of unclean handling.[18] And several months before the administrative hearing in this case, FDA officials visited processing facilities in India and determined the nature of conditions there first hand. The district court described what the delegation saw:

> [T]he delegation observed unscreened, fly-infested processing areas; inadequate icing of shrimp subjected to temperatures in excess of 90° F.; the placement of porous shrimp-holding pans on heavily-travelled floors; and the use of pitted and cracked work surfaces covered with the residue of fecal matter from previously processed frogs. At a shrimp land-

ing area, FDA officials observed hundreds of people, mostly barefoot and dressed in soiled clothing, milling around the dock where the shrimp were unloaded; poor icing of shrimp; and the use of bamboo baskets, which are virtually impossible to sanitize, to collect shrimp.[19]

Together with the FDA's understanding of the cause of salmonella in shrimp generally, these observations provided more than enough support for the agency's conclusions that the bacteria had been at least partly introduced by man.

B. *Did the FDA show that salmonella "may render" shrimp unhealthy?*

Appellants claim the evidence does not support the FDA's determination that salmonella "may render [shrimp] injurious to health." This complaint is groundless. The record indicates that ingestion of even small amounts of the bacteria can cause serious cases of food poisoning in some people.[20] Appellants do not dispute the medical evidence; indeed, their own expert witness confirmed the danger.[21] Instead, they rely on (1) the fact that few, if any, cases of salmonellosis traced to shrimp have been reported and (2) their expectation that consumers will properly cook and store the shrimp and thus prevent contraction of the disease.

■ The FDA offered several reasonable explanations for the low number of reported cases of salmonellosis from shrimp: The

16. *See also Sugarman v. Forbragd*, 267 F.Supp. 817, 824 (N.D.Cal.1967), *aff'd*, 405 F.2d 1189 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2103, 23 L.Ed.2d 747 (1969); *Church of Scientology of California v. Richardson*, 437 F.2d 214, 217 (9th Cir. 1971).

17. *See, e.g.,* J.A. 40–41 (plaintiffs' expert testifies that salmonella is introduced to shrimp through waters contaminated, for example, by fecal matter; notes that water far from land is not generally contaminated); *id.* at 75 (National Academy of Sciences publication, *supra* note 5, states that "[s]almonellae are not known to be indigenous" in seafoods); *id.* at 175–76 (FDA official testifies that "[s]everal countries routinely export salmonella-free shrimp to the United States" and that "when salmonella[e]

are found in seafood, including shrimp, their presence is almost always attributable to insanitary and improper processing procedures"); *id.* at 251 (defendants' expert states that salmonella does not ordinarily occur in shrimp and is usually caused by "insanitary handling and/or processing practices or harvesting from polluted waters").

18. J.A. 174.

19. D.Ct.Op. at 1088.

20. J.A. 72, 252.

21. J.A. 91.

sources of information on which appellants rely report only a small proportion of salmonella cases; reporting of "home episodes" is rare; specific cases may often be attributed to the wrong sources; and shrimp products are consumed in much smaller quantities than other foods which may contain salmonella.[22] These explanations were supported by the record and adopted by the district court.[23] Accordingly, we agree with the court that the "absence of documentation does not foreclose the [FDA's] discretion to determine that salmonella in shrimp may be injurious to the health of those who consume it."[24]

■ Nor are we comforted by appellants' sanguine assurances that consumers will properly cook and store the shrimp. The FDA has authority to ban contaminated articles from import notwithstanding promises that the deleterious condition will be corrected. *See United States v. 52 Drums of Maple Syrup*, 110 F.2d 914, 915 (2d Cir. 1940). Moreover, there was evidence in the record that many people either do not cook shrimp properly[25] or, like the patrons of Japanese restaurants, eat it raw.[26] Under these circumstances, the FDA was well within its authority in concluding that salmonella "may render" shrimp injurious to health.

*Affirmed.*

---

**22.** *See, e.g.*, J.A. 44, 74, 94, 129.

**23.** D.Ct.Op. at 1092.

**24.** *Id.*

**25.** *E.g.*, J.A. 73. *See also* J.A. 79, 95–98.

**26.** *See* J.A. 214–24.